## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

LOIS FOSTER,                          )
                                      )
     Plaintiff,          )
vs.                                   )  NO.  CIV-10-0573-HE
                                      )
APACHE CORPORATION,                   )
                                      )
     Defendant.         )

## <u>ORDER</u>

  Plaintiff Lois Foster brings this putative class action against defendant Apache Corporation ("Apache") for underpayment of royalties on gas production.  Ms. Foster seeks to represent the following class in this suit:

> All non-excluded persons or entities who are or were royalty owners in Oklahoma wells where Apache Corporation is or was the operator (or, as a non-operator, Apache separately marketed gas) from and after January 1, 2000. The Class Claims relate only to payment for gas and its constituent substances produced from the wells. The Class does not include overriding royalty owners or other owners who derive their interest through the oil and gas lessee.

> The persons or entities excluded from the Class are agencies, departments or instrumentalities of the United States of America and the State of Oklahoma, publicly traded oil and gas exploration companies and their affiliates, and persons or entities that Plaintiff's counsel is, or may be, prohibited from representing under Rule 1.7 of the Oklahoma Rules of Professional Conduct.

Presently pending before the court are plaintiff's motions for class certification, to strike certain of defendant's evidentiary materials, to file an amended complaint, and to strike Apache's position as to whether the undersigned judge should recuse from this case.[1]  All

---

[1]*The parties agree there is no basis for recusal, see Doc. Nos. 141 & 145, and the court so found at the hearing on June 25, 2012.  See Transcript at 3-4 [Doc. #186].*

motions have been fully briefed and are at issue.  The motion for class certification and motions to strike came before the court for hearing on June 25-26, 2012, where the court received evidence and heard the arguments of counsel.  After consideration of the parties' submissions, the court concludes plaintiff's pending motions should be denied or are rendered moot in the circumstances existing here.

## I.  Background

**A. Factual background**[2]

Ms. Foster owns royalty interests in six Oklahoma gas wells.  Her interests in these wells are governed by oil and gas leases with Apache, which is an oil and gas exploration and production company.  During the class period, defendant has been the well operator for over 1,200 producing gas wells in Oklahoma and has marketed gas production for over 10,000 royalty interest owners.[3]  Apache has sold gas production from the class wells under thirty different marketing arrangements to over two dozen unaffiliated purchasers.[4]  These purchasers include midstream processing companies, gas marketing companies, and end-

---

[2]*The following background facts are either undisputed or are found to be established for purposes of the present motions.*

[3]*When Apache is the operator of the well, it markets production on behalf of itself and other working-interest owners.  When Apache is not the well operator, it sometimes elects to market the production attributable to its own working interest separately.*

[4]*Plaintiff asserts that Apache owned an interest in one of the companies which purchased defendant's gas production until 2003.  Apache claims it sold its interest in that company in 1998, before the class period. For present purposes, the court concludes there are no affiliate sales involved.  A contrary conclusion would likely present an additional obstacle to class certification.*

consumers.

Although it has several marketing arrangements, Apache sells its gas production at one of two general points in the gas-marketing process.  Gas is either sold when it is in a condition such that it can enter (or has entered) an interstate transmission pipeline, or gas is sold to a midstream company at the point it enters the gathering lines on the leased premises,[5] before the gas has been fully processed such that it can enter an interstate pipeline.  Apache sells approximately 70% of its gas production downstream at or after it enters the transmission line and markets the remaining 30% to midstream companies.

When natural gas (methane) comes out of the ground, the gas stream often contains water, heavier hydrocarbons,[6] and other impurities.  Additionally, the raw gas stream is usually of low pressure.  The relative proportion of these constituents and the pressure of the gas can vary from well to well.  Before natural gas can be sold in the interstate gas market, it must ordinarily undergo certain processing functions which place the gas in a homogenous condition capable of entering an interstate pipeline.  This processing includes removing water, impurities, and NGLs, as well as compressing the residue gas.

When Apache sells gas production at or after gas enters the interstate pipeline, it first pays a midstream company to process the gas into a condition where it can enter that

---

[5]*"Gathering lines" are the smaller, low-pressure gas lines which run from each well to a central facility in or near the field.  See Owen L. Anderson et al., Hemingway Oil and Gas Law and Taxation § 7.4(C), at 347 (4th ed. 2004).*

[6]*These heavier hydrocarbons include butane, propane, pentane, and others.  During processing, these hydrocarbons are removed from the gas stream as liquids. The result is two end-products: residue gas and natural gas liquids ("NGLs").*

pipeline.  Under the terms of its cash agreements with the midstream companies, Apache is charged separate fees for gathering, processing, and compression.[7]   In addition, the midstream companies are entitled to  use whatever gas is necessary to fuel their gas plants without fee, and they keep the value of the NGLs for themselves.[8]  When Apache pays royalty to its lessees on gas marketed in this manner,[9] it bears the entire cash compression fee itself, as well as the costs necessary to place the gas into the gathering line.  However, the royalty owners share proportionately in the gathering and processing fees charged by the midstream companies, and royalty is not paid on the gas used for fuel to run the gas plant or on the NGL value retained by the midstream companies.

For the 30% of its gas marketed to the midstream companies, Apache purports to sell the entire gas stream as it enters the gathering lines, before the gas has been fully processed. The midstream companies gather, dehydrate, compress and process the gas stream, and then resell the residue gas and NGLs in the interstate market.  Midstream companies use gas to fuel their processing plants under these arrangements as well.  Gas sold by Apache under these contracts is sold on a percentage-of-proceeds ("POP") or percentage-of-index ("POI")

---

[7]*Plaintiff refers to this type of marketing arrangement as a "cash contract" because Apache pays the midstream companies a cash fee for performing processing functions.*

[8]*In 2011, Apache re-negotiated one of its cash contracts so that it received a portion of the value the midstream company receives from selling the NGLs.*

[9]*Although Apache maintains that it bases its royalty calculation on the specific language of each lease, the evidence establishes that, in all but the most exceptional of circumstances, Apache treats all royalty-interest owners in a well the same when it calculates and pays royalty, regardless of the leases' specific language.*

basis, whereby Apache receives a large percentage (usually 80-90%) of the amount the midstream company ultimately receives for selling the residue gas and NGLs downstream.[10] For gas marketed under these contracts, Apache pays royalty based on the amount it receives from the midstream company without deduction for any processing costs necessary for the gas to enter the gathering lines. Additional royalty is not paid on the fuel gas used by midstream companies to power their processing plants.

Under either type of arrangement, Apache performs some initial on-lease activities necessary to place the gas into the gathering lines. For example, Apache often uses a mechanical separator on the lease to remove liquids from the gas stream before it enters the gathering line.[11] And for gas produced from at least one well, Apache passed the gas through a refrigeration unit on the lease to remove the NGLs. Each midstream contract—whether POP, POI, or cash—contains different minimum or maximum requirements for water, carbon dioxide, sulphur, and compression, among others, and Apache bears the full cost of placing the gas stream into that condition on the lease.

Ms. Foster owns an interest in currently-producing wells where the gas is and has been sold to DCP Midstream, LP under a POP contract. Additionally, she owns an interest

---

[10]*The midstream companies' compensation under these POP contracts is the 10-20% of the proceeds they keep from selling the residue gas and NGLs, along with the gas used to fuel their gas plants. Any distinctions between POP and POI contracts do not appear to be material for present purposes. Therefore, consistent with the parties' briefing, the court refers to these two types of arrangements collectively as POP contracts.*

[11]*Although some initial liquids would be removed at this point, the gas stream usually contains entrained water and hydrocarbons which would be removed through further processing at a later point before the residue gas enters a transmission line.*

in a well which is no longer producing but which was producing during the class period.  Gas produced from the latter well was processed under a cash agreement with Enogex Gathering and Processing LLC.

## B.  Overview of Oklahoma royalty law

The primary compensation mineral-interest owners receive for the production of oil and gas is a royalty, which is usually a fractional share in production or the value of production, free of the costs of production.  *See* <u>Mittelstaedt v. Santa Fe Minerals, Inc.</u>, 954 P.2d 1203, 1205, n.1 (Okla. 1998); *Hemingway* § 2.5, at 56.  Ordinarily, the royalty percentage and other relevant terms are contained in the royalty clause of an oil and gas lease.[12]  Under Oklahoma law, the general rule is that royalty is owed on the value of gas at the point a marketable product is obtained.  *See* <u>Wood v. TXO Prod. Corp.</u>, 854 P.2d 880, 883 (Okla. 1992).[13]  This marketable-product rule stems from the lessee's implied duty to market production.  <u>Mittelstaedt</u>, 954 P.2d at 1205 (quoting <u>Wood</u>, 854 P.2d at 883)).  Under this rule, the royalty interest does not share in "transportation, compression, dehydration, and

---

[12]*An exception to this is when a mineral owner has not signed a lease and has been force-pooled under 52 Okla. Stat. § 87.1(e).*

[13]*A lessor and lessee could conceivably establish a different standard by agreement in the lease.  See <u>Mittelstaedt</u>, 954 P.2d at 1205.  There is disagreement, however, as to how specific the lease language must be to alter the default rule.  Compare <u>Fankhouser v. XTO Energy</u>, No. CIV-07-0798-L, 2012 WL 601415, at \*2 (W.D. Okla. Feb. 23, 2012) (holding that the phrase "at the well" does not negate the marketable-product rule) and <u>Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.</u>, 281 F.R.D. 477, 482 (D. Kan. 2012) (holding the same under Kansas law), with <u>Naylor Farms, Inc. v. Anadarko OGC Co.</u>, No. CIV-08-0668-R, 2011 WL 7053787 (W.D. Okla. July 14, 2011) (holding that the phrase "at the well" in the royalty clause alters the marketable-product rule).*

blending costs *when such costs are associated with creating a marketable product*." Mittelstaedt, 954 P.2d at 1205 (emphasis added).  While it is easy to articulate the marketable-product rule, application of it to a particular circumstance is difficult.[14]  Doing so in the class action context is even more difficult, and federal and state courts have reach varying conclusions in applying the pertinent rules.[15]

Also relevant to the court's determination in this case is that royalty interests in Oklahoma wells producing natural gas are communitized under Oklahoma's Production Revenue Standards Act, 52 Okla. Stat. §§ 570.1-570.15 ("PRSA").  "In each month, each royalty interest owner shall share in all proceeds derived from the sale of gas production from a well to the extent of such owner's royalty interest in that well without regard to the identity of the producing owners during that period."  52 Okla. Stat. § 570.4(A).  Ordinarily, this is accomplished by each producer forwarding the royalty share of its gas production to the well operator, who then pays the royalty-interest owners in the well according to their proportionate interests.  *See id.* § 570.4(B).  Thus, all royalty-interest owners in a well share in a common "royalty pot" such that "shorting the pot shorts everyone who shares the

---

[14] "An individual who seeks to predict a court's potential application of the [marketable-product rule] to a particular set of facts may have as much luck trying to tack jello to a wall." Byron C. Keeling & Karolyn King Gillespie, The First Marketable Product Doctrine: Just What is the "Product"? 37 St. Mary's L.J. 1, 82 (2005).

[15] See, e.g., Foster v. Merit Energy Co., No. CIV-10-0758-F, 2012 WL 1664153 (W.D. Okla. May 14, 2012) (order denying certification of a class of royalty owners pursuing claims for underpayment of royalty on gas production); Beer v. XTO Energy, Inc., No. CIV-07-0798-L, 2009 WL 764500 (W.D. Okla. March 20, 2009) (order certifying a class of royalty owners pursuing claims for underpayment of royalty on gas production).

proceeds of the royalty pot." <u>Chieftain Royalty Co. v. QEP Energy Co.</u>, 281 F.R.D. 499, 506 (W.D. Okla. 2012).

## C.  Summary of the claims

Plaintiff, on behalf of herself and the proposed class, claims that Apache has been systemically underpaying royalty on gas production.  She asserts the following claims against Apache: breach of duty, tortious breach of contract, actual and constructive fraud, deceit, breach of implied duty to market, unjust enrichment, and civil conspiracy.  She seeks compensatory and punitive damages as well as an accounting and a temporary restraining order.

Ms. Foster's position is that gas is not marketable as a matter of law until the residue gas is fungible and can be transmitted through an interstate pipeline.  She contends that Apache must bear all costs necessary to place gas in that condition without deduction from the royalty share unless a royalty-interest owner's lease specifically states which deductions are to be shared by the royalty interest.  For gas marketed downstream, plaintiff contends Apache underpaid royalty because the royalty-interest owners shared in gathering and processing costs and did not receive royalty on the fuel gas used or NGLs sold by the midstream companies.  Similarly, plaintiff claims Apache underpaid royalty on gas sold to the midstream companies at the wellhead because royalty was not paid on the proceeds retained by the midstream companies for selling the residue gas and NGLs, or on the fuel gas used in processing the gas stream.  Additionally, Ms. Foster argues that Apache fraudulently concealed that it was taking deductions from royalty for processing costs by failing to

disclose those deductions on the "check stubs" the royalty-interest owners received with their royalty checks.

Apache's position is that its gas production at issue here is marketable at the point the gas stream enters a gathering system, regardless of whether Apache retains title to the gas or sells it to a midstream company. Therefore, according to Apache, its royalty calculations and payments were lawful and its check stubs were not fraudulent because all deductions which were taken by it were disclosed. Additionally, Apache urges that variations in the class leases' royalty clauses affect the application of Oklahoma's marketable-product rule, regardless of whether a royalty clause specifically identifies which costs may be shared by the lessor.

## II. Plaintiff's Motions to Strike Certain Affidavits

Plaintiff has filed four motions to strike certain affidavits relied upon by Apache in its response to plaintiff's motion for class certification. Plaintiff's chief complaint is that the affidavits refer to class wells outside of fourteen so-called "sample wells." She argues the parties agreed that fourteen wells would be representative of over 1,200 class wells for all purposes and that the class-certification determination should be based only on evidence pertaining to those fourteen wells. The court disagrees. The discovery stipulation was that the parties would agree on one well from each of Apache's marketing arrangements as being representative of those arrangements. After such wells were identified, the parties agreed that Apache would "locate and produce sufficient monthly payment and remittance information to demonstrate how the royalty was calculated as to a royalty owner in that

9

well(s) for one month per year." Amended Joint Discovery Statement ¶ 2, at 2-3 [Doc. #59]. There is nothing in the discovery stipulation which limits all class certification evidence and briefing to the fourteen sample wells. Additionally, it is undisputed that Apache has produced its leases and marketing agreements covering all class wells through discovery, so plaintiff is not unfairly prejudiced here.

Ms. Foster also argues that portions of the affidavits contradict prior deposition testimony or are not based on personal knowledge. Most of her arguments in this regard are repetitive of her motion for class certification and related briefing. Ms. Foster's objections have been noted and considered in the court's determination of the background facts discussed above, and there is no apparent reason for taking any action beyond that in the circumstances existing here. Accordingly, plaintiff's motions to strike Apache's affidavits will be denied.

### III.  Class Certification

Class actions are an exception to the general rule that a person be a party to a lawsuit before the court's judgment can bind him. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550 (2011). If the class representative does not or cannot adequately represent absent class members, the court's judgment will not bind those members, *e.g.,* Pelt v. Utah, 539 F.3d 1271 (10th Cir. 2008), and a primary purpose of the class action mechanism—litigation efficiency—will be frustrated. Thus, "a class representative must be part of the same class and possess the same interest and suffer the same injury as the class members." Wal-Mart, 131 S. Ct. at 2550 (quotation omitted).

Rule 23 sets out the requirements necessary to prosecute a class action in federal court.  Subsection (a) provides that a class action is appropriate only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

In addition, the class must fit into one of the Rule 23(b) categories.  Ms. Foster seeks class certification under Rule 23(b)(3), which requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  If the requirements of Rule 23(a) and (b) are satisfied, then class counsel must be appointed consistent with Rule 23(g).

The court has discretion in determining whether to certify a class action so long as it utilizes the proper legal framework.  *See* Shook v. El Paso County, 386 F.3d 963, 967-68 (10th Cir. 2004).  Although the plaintiff ultimately bears the burden of showing that the Rule 23 requirements are met, the court must engage in its own "rigorous analysis" to ensure that certification is appropriate.  *See id.* at 968 (citation omitted).  This often requires the court to look beyond the pleadings and consider the "factual and legal issues comprising the plaintiff's cause of action."  Wal-Mart, 131 S.Ct. at 2552 (quoting Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 160 (1982)).  The determination of whether a motion for class

11

certification should be granted  is "a highly fact-intensive matter of practicality."  Monreal v. Potter, 367 F.3d 1224, 1238 (10th Cir. 2004).   Applying these standards, the court concludes the proposed class does not satisfy Rule 23.

## A.  Numerosity

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable."  Here, there are over 10,000 members of the proposed class. Many of the class members reside in Oklahoma but many of them do not.  Apache does not contest that the proposed class satisfies the numerosity requirement, and that element is established.

## B.  Commonality

Rule 23(a)(2) requires that "there are question of law or fact common to the class." To satisfy this requirement, plaintiff need only demonstrate there is a single question of law or fact common to the entire class.  Wal-Mart, 131 S. Ct. at 2550-51.  However, merely raising a common legal theory is not enough because commonality requires a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[16]  Wal-Mart, 131 S. Ct. at 2551.  A plaintiff cannot satisfy

---

[16]*Plaintiff argues that commonality is satisfied if the resolution of a single question will affect a significant number of the class members' claims. Prior to Wal-Mart, some courts had reached that conclusion. E.g. Forbush v. J.C. Penney Co., 994 F.2d 1101 (5th Cir. 1993). However, in Wal-Mart the Supreme Court clarified that a common question must be one which "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551 (emphasis added).  Accord M.D. ex rel. Stukenburg v. Perry, 675 F.3d 832, 839-41 (5th Cir. 2012) (holding that after Wal-Mart, "the commonality test is no*

commonality by merely alleging "systemic violations of the law"; instead, "a discrete legal or factual question common to the class must exist." <u>Stricklin</u>, 594 F.3d at 1195. The class-action mechanism must be able "to generate common *answers* apt to drive the resolution of the litigation." <u>Wal-Mart</u>, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (April 2009) and adding emphasis).

Ms. Foster identifies three primary issues which she contends are common questions justifying class certification:[17] 1) whether Apache engaged in a common practice of calculating royalty the same for all royalty-interest owners in a well; 2) the point at which gas becomes marketable under Oklahoma law; and 3) whether Apache failed to pay royalty on "fuel gas." The court concludes these issues are not sufficient to warrant class certification in the circumstances existing here.

### 1. *Common practice*

Plaintiff argues that Apache's practice of paying all royalty owners on the same basis, regardless of particular lease language or other circumstances, provides the necessary common question. She suggests the court should certify the class on the basis of Apache's common royalty payment practice and address later how that may impact the claims of

---

longer met when the proposed class merely establishes that there is at least one issue whose resolution will affect all or a significant number of the putative class members." (quotations omitted)).

[17]She also argues that certain other common questions exist and those are discussed below. Answering those questions, however, is dependent on the resolution of the three issues listed here.

particular class members.   However, that approach largely assumes away what is, for certification purposes, the pertinent inquiry.  Per Wal-Mart, the purpose of the class approach is to generate common *answers* which drive the resolution of the litigation.   Simply identifying a common practice of the defendant, by itself, does not accomplish that.[18] Whether defendant's payment practices violate its obligations to any class member is necessarily dependent on what those obligations were—and those may differ from class member to class member.

As noted above, the lessee's obligations to the mineral owner are determined largely by the terms of the oil and gas lease.  Mittelstaedt and other Oklahoma cases make clear that, in determining the nature and extent of the obligation to pay royalty, the terms of the particular lease must be examined.  *See* Mittelstaet, 954 P.2d at 1205 (stating that the court must "fix the rights and duties of the parties according to the language of the leases and the implied covenants that go with them.").   It is true, as plaintiff argues, that the Oklahoma courts have usually interpreted varying royalty clauses as being consistent with the marketable-product rule as formulated in Mittelstaedt and other cases.  *Cf id.* at 1216-17 (Opala, J., dissenting in part) ("We should not needlessly complicate royalty-clause interpretation by focusing solely on specific terms, such as 'market value,' 'market price,' 'proceeds,' or 'amount realized' . . . Royalty clauses may contain slightly different

---

[18] *"[U]niformity of performance allows for true representative litigation only when joined with uniformity of obligation."  Steven S. Gensler, Civil Procedure: Class Certification and the Predominance Requirement under Oklahoma Section 2023(B), 56 Okla. L. Rev. 289, 306 (Summer 2003).*

terminology, but most create similar obligations.").[19]  However, that result is not automatic

and, as plaintiff concedes, individual lease differences can alter the default rule.

The evidence here establishes that Apache has over ten thousand leases applicable to

the interests of the proposed class.[20]  The royalty clauses in those leases vary.  Plaintiff

argues, based only on her analysis of the leases involved in the sample wells, that most are

_____

[19]*Although contained in a partially dissenting opinion, this observation is consistent with Oklahoma case law.  Oklahoma cases appear to treat both the "gross proceeds" clause discussed in* Mittelstaedt *and the "market price at the well" clause in* Wood *as imposing the same obligation on the lessee to pay royalty.  Accord* Fankhouser v. XTO Energy, Inc. *No. CIV-07-0798-L, 2012 WL 601415, at \*2 (W.D. Okla. Feb. 23, 2012); see also Owen L. Anderson, Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically? Part 2, 37 Natural Res. J. 611, 683-84 (Summer 1997) ("[W]hether royalty is due on 'market value,' 'market price,' 'amount realized,' 'proceeds' . . . or 'gross proceeds,' and whether the royalty is described as being due 'at the well,' 'at the wellhead,' 'at the mouth of the well,' 'free of cost, in the pipeline,' or at an unspecified location, royalty should be paid on the value of gas as a first-marketable product in the vicinity of the well.").*

[20]*Although the record establishes that Ms. Foster has an interest in six of the class wells, it is unclear as to how many leases Ms. Foster has covering those wells. It is clear, however, that one of Ms. Foster's leases with Apache contains the following royalty clause:*

*In consideration of the premises the said lessee covenants and agrees:*

*\* \* \**

*2nd.    To pay lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, 3/16ths of the gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than 3/16ths of the actual amount received by the lessee, said payments to be made monthly.*

*[ Doc. #152-64].  Whether this royalty clause creates the same obligation as the gross proceeds clause discussed in* Mittelstaedt *is unclear and appears to depend on whether the phrase "but in no event more than" is simply repetitive of the term "proceeds" or adds something else to the mix. This issue has not been squarely addressed by both parties and the court need not resolve it here.*

"gross proceeds" leases of the type discussed in <u>Mittelstaedt</u> and that others are like the "market price at the well" clause involved in <u>Wood</u>. If that was the extent of the differences, the conclusion of a common question would likely flow from that. But that is not the extent of the differences. Defendant identifies what it views as 45 distinct royalty clauses in the leases on the class wells. Some of those clauses are clearly consistent with the marketable product rule, but some are not. Others are probably consistent with the rule, but not clearly so. In short, the leases create what are, in at least some instances, varying or arguably varying royalty obligations. As a result, Apache's common practice of paying all royalties in a common fashion may violate some leases but not others. Under these circumstances, and while the question is close,[21] the court is not satisfied that proof of Apache's alleged common practice provides a "common question" the answer to which would "drive the resolution of the litigation."

### 2. Point of marketability

Ms. Foster also argues that determination of the point at which gas becomes marketable is a question that is common to the entire class. She contends that the question of whether her view of Oklahoma law—that gas is not in marketable condition until it is of

---

[21]*The fact that Apache pays virtually all royalty owners in the same fashion, while not necessarily establishing a common question for certification purposes, is at least some indication that Apache does not view lease differences as likely to impose different obligations upon it very often. This conclusion is further bolstered by the fact that several other oil and gas production companies appear to have developed similar practices. See, e.g, <u>Foster v. Merit Energy Co.</u>, 2012 WL 1664153, at \*3 (noting that the defendant admitted for class certification purposes that it calculated and paid royalty in the same manner for all royalty-interest owners); <u>Chieftain Royalty Co.</u>, 281 F.R.D. at 503 (finding that defendant "generally utilizes the same formula in calculating payments to royalty owners . . .").*

pipeline quality—is the glue that holds this class together.  However, in arguing for such a categorical approach to when marketable condition is achieved, plaintiff relies on a formulation that is plainly inconsistent with Oklahoma law.

The critical case here, obviously, is Mittelstaedt.  In that case, the Oklahoma Supreme Court considered whether, under the marketable-product rule, royalty owners could properly be required to share in the costs of transportation, compression, dehydration, and blending performed by the lessee off the leased premises.[22]  *See* 954 P.2d at 1204-05.  The court answered the question with a two-pronged holding: First, these costs are not to be shared by the lessor if they are "associated with creating a marketable product." *Id.* at 1205.  Second, such costs may, however, be shared by the lessor if the lessee can establish: "(1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest." *Id.*  "Thus, in some cases a royalty interest may be burdened with post-production costs, and in other cases is may not." *Id.*

Most important for present purposes is the nature of the "associated with creating a marketable product" inquiry.  While Mittelstaedt discussed (and viewed its result as consistent with) prior Oklahoma cases taking a more categorical approach to particular processing costs in certain circumstances, the standard articulated in Mittelstaedt as to the

---

[22]*The lessee in Mittelstaedt had performed some compression and related activities at the wellhead.  The gas was then moved to an off-premises location where third parties performed additional processing.  The lessee bore the costs of the on-lease activities but shared with lessors the costs of the off-lease activities.*

costs associated with creating a marketable product is fact specific:

> Post-production costs must be examined on an individual basis to determine if they are within the class of costs shared by a royalty interest.
>
> The lessee has a duty to provide a marketable product available to market at the wellhead or leased premises.  Generally, custom and practice in the industry are used in determining the scope of duties created by the lease.

*Id.* at 1208.  Mittelstaedt did not provide a categorical answer to the question of when gas is in a marketable condition and plainly viewed the question as *not* being one subject to a categorical answer.  *See generally id.* at 1208-10; *accord* Foster v. Merit Energy Co., 2012 WL 1664153, at *5 (noting that Mittelstaedt "left marketability to be determined as a question of fact . . .").  Plaintiff's effort to supply a common question by proposing a different approach is simply inconsistent with Oklahoma law.[23]  Thus, in light of the various marketing arrangements and other factors involved here, the point at which gas becomes marketable is not a question which can be answered on a class-wide basis, at least for a class as broad as this one.

### 3.  Fuel gas

Ms. Foster claims Apache failed to pay royalty on gas used as fuel by the midstream companies in processing and compressing the gas production.  Plaintiff bases this claim on lease clauses which specifically provide that royalty is to be paid on gas "sold or used off the

---

[23]*To some extent, this discussion overlaps considerations which might otherwise be addressed later in a post-certification context.  However, given the nature of the marketable-product inquiry under Oklahoma law, the court sees no reason to premise a certification decision on a "common question" that is already resolved.*

premises, or in the manufacture of products therefrom." *See* Doc. # 152-65. However, in order to determine whether Apache should pay additional royalty in this context, the court must determine whether Apache *has* already paid royalty on the fuel gas. The answer to that question may depend on whether the gas was sold under a POP contract or processed under a cash agreement.

When Apache markets its gas production to midstream companies under a POP agreement, it purports to sell the entire gas stream at the point the gas enters the gathering system. In compensation, Apache receives a percentage of what the midstream company later sells the gas for and pays royalty based on that amount. The fuel gas is used by the midstream company after this point to power its processing and compression activities. Apache maintains that because it sold the entire gas stream before the gas was used as fuel, its royalty calculation *does* compensate the royalty-interest owners for the fuel gas. Plaintiff contends this is a sham. Whether it is or is not depends on whether each particular POP contract is valid, a question which is peculiar to those owners who are interested in wells where gas production was marketed under each POP agreement and the answer to which may vary with the particular circumstances under which the marketing occurred. On the other hand, whether additional royalty should have been paid on fuel gas used to process gas under the cash contracts appears to involve a separate set of issues. Accordingly, the fuel gas claim does not provide a basis for certifying the proposed class.

### 4. Other issues

Plaintiff also claims that the existence of a fiduciary duty and the question of whether

Apache fraudulently concealed that it was taking improper deductions before paying royalty are common questions.  Whether Apache breached any fiduciary duty depends on whether Apache should have paid additional royalty, which in turn depends on the individual leases and circumstances under which the gas was marketed.  Therefore, determining whether and to whom a fiduciary duty is owed is not a determination "apt to drive the resolution of the litigation."  Similarly, the question of whether Apache fraudulently concealed that it was taking deductions depends on whether those deductions were proper, which depends on the language of the leases and other individualized circumstances.

In short, the court concludes that plaintiff has not shown that the class as presently formulated shares common questions which are apt to drive this litigation.

## C. Typicality

Rule 23(a)(3) requires that Ms. Foster's claims be typical of the class's claims.  Typicality requires the representative to be a member of the class and "possess the same interest and suffer the same injury" as other class members.  1 William B. Rubenstein et al., *Newberg on Class Actions* § 3:28 (5th ed. 2011) (citing <u>Falcon</u>, 457 U.S. at 156).  Typicality limits the class's claims to those fairly encompassed by the class representative's claims such that self-interested litigation by the class representative necessarily advances the interests of the class as a whole.  *See* <u>Gen. Tel. Co. of the N.W., Inc. v. E.E.O.C.</u>, 446 U.S. 318, 330 (1980); 1 *Newberg on Class Actions* § 3:29.  Typicality does not, however, require a complete identity of claims between the class representative and the class members.  *See* <u>DG ex rel. Stricklin v. Devaugh</u>, 594 F.3d 1188, 1198 (10th Cir. 2010).  Differing individual

circumstances will not defeat typicality so long as the class representative's claims and those of the class members share the same legal theory. *See id.* at 1198-99. Nevertheless, the class representative may not assert claims on behalf of the class that she herself does not possess. *See* Falcon, 457 U.S. at 156-57 (citing E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 394, 403)).

The court does not view typicality as being determinative of the present motion. Ms. Foster seeks money damages on behalf of herself and the other members of the proposed class based on an alleged systemic underpayment of royalty. If commonality was otherwise present, her self-interested litigation would advance the interests of the absent class members. Ms. Foster is not asserting claims for a type of injury that she herself did not allegedly suffer. Although some of the class claims are based on breach of contract while others are based on tort or restitution theories, all class claims are premised on the same allegation of systemic underpayment of royalty by Apache. Because the class members' claims are based on this same alleged common practice and all class members allegedly suffered the same injury and seek the same general remedy, typicality is not destroyed merely because the class members' specific legal theories of recovery may vary. This is particularly so where the class members' interests have been communitized by the PRSA, such that each royalty-interest owner in a well—regardless of any contractual or "special" relationship with Apache—is injured if Apache underpays royalties under the terms of its leases covering that well.[24]

---

[24]*It is for this reason that a class of royalty-interest owners could conceivably include members who have no contractual relationship with Apache, even if those owners are only*

Apache contends that typicality is not satisfied because Ms. Foster is subject to a unique defense. It contends that Ms. Foster could not have reasonably relied on any of Apache's alleged misrepresentations because she was a class member in a prior case involving similar claims against Apache for an earlier time period. Consequently, according to Apache, some of Ms. Foster's claims may be time-barred where the absent class members' claims may not be. The court is unpersuaded. Even if Apache is ultimately correct that Ms. Foster could not have reasonably relied on the check stubs, she would still have some claims typical of the class's claims (assuming commonality was otherwise satisfied). All claims would not be time-barred and the resolution of her remaining claims could conceivably resolve issues typical of the class's claims. The court concludes typicality has been sufficiently established, or at least would have been had the commonality requirement been met.

## D.  Adequacy

Rule 23(a)(4) requires that the class representative must be able to "fairly and adequately protect the interests of the class."[25] This requirement "ensures that the class's champion will pursue its interests sufficiently well so as to produce a judgment that can

_____

*interested in wells where Apache is a non-operating producer.*

[25]*Before 2003, courts interpreted Rule 23(a)(4) to require scrutiny of both the class representative's adequacy and that of the attorney who sought to be class counsel. In 2003, Congress added Rule 23(g), which specifically governs the appointment of class counsel when the court certifies a class. Given its disposition of the current motion, the court need not discuss the adequacy of Ms. Foster's attorneys, though it seems clear they would pass muster under Rule 23(g).*

fairly bind all members of a group who cannot appear before the court individually." 1 *Newberg on Class Actions* § 3:50. In this context, the court asks two questions: 1) does the class representative have any conflicts of interest with the absent class members, and 2) will the class representative prosecute the action vigorously on behalf of the class? Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002). Apache contends Ms. Foster fails on both counts.

Apache argues that Ms. Foster has a conflict of interest with the absent class members because a claim for an accounting is asserted and some class members may end up owing Apache money under the terms of their leases. This is based on Apache's argument that the compression fee it bore exclusively as to the gas production sold downstream could have been shared proportionately by the royalty-interest owners. Thus, according to Apache, some class members are better off with the status quo and a conflict of interest therefore exists. This alleged conflict is speculative, however, because Apache assumes it will ultimately prevail on the merits.[26] A speculative conflict of interest will not ordinarily defeat class certification. *See* Arkalon Grazing Assoc. v. Chesapeake Operating, Inc., 275 F.R.D. 325, 330 (D. Kan. 2011) (citations omitted); 1 *Newberg on Class Actions* § 3:58.

Apache also challenges Ms. Foster's ability to vigorously prosecute the class members' claims on the basis that she lacks sufficient knowledge of the class claims. But

---

[26]*Determining which costs are necessary to create a marketable product is the primary merits issue underlying the class's claims. If it turns out these compression charges were necessary to create a marketable product, then there would not be any conflict of interest between Ms. Foster and absent class members.*

Rule 23(a)(4) does not require a detailed knowledge of the class's claims.  *See* New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007); Arkalon Grazing Assoc., 275 F.R.D. at 330.  Instead, the class representative need only demonstrate a basic understanding of the class claims as well as an understanding of his or her duties as the class representative and a willingness to fulfill those duties.  Ms. Foster has done so.  *See* Affidavit of Lois Foster [Doc. #152-66].  That Ms. Foster will need to rely on the assistance of counsel is unremarkable.  Ms. Foster's self-interested pursuit of her own claims would adequately protect the interests of the absent class members if common questions were present, and this element is therefore established.

**E. Predominance and superiority**

As Rule 23(a)'s requirements have not all been met, it is not technically necessary to address the further question of whether Rule 23(b) is satisfied.  However, as the court views Rule 23(b) as providing a further basis for its denial of the certification motion, those requirements are discussed here.  Even if some of the issues plaintiff relies on as showing the necessary common question were resolved otherwise, the court would nonetheless conclude that the more exacting predominance standard of Rule 23(b)(3) is not met.

Rule 23(b) requires the court to find that common questions will "predominate over any questions affecting only individual members."  The analysis of commonality and predominance are necessarily related, but the predominance standard is "far more demanding." Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)).  Additionally, the court must find that

"a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b).  In making these findings, the court must consider the following factors, among others:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*  In this context, the court is looking for "fatal dissimilarities" between class members which impede the common resolution of the class members' claims.  *See* Nagareda, *supra*, at 132.  "Heaps of similarities do not overcome dissimilarities that would prevent common resolution."  *Id.*

Even if the existence of one or more common questions were assumed, the court would still have to address and resolve a variety of other issues to bring this case to a conclusion.  The most obvious of these issues is the varying royalty clauses of the class leases. It is not clear what degree of specificity is required for a royalty clause to alter the marketable-product rule in Oklahoma.  Although most royalty clauses involved here may ultimately be determined to embrace the marketable-product rule, the parties and the court would still have to sift through thousands of varying leases to reach that conclusion. Perhaps such an adjudication could be done on a categorical basis as opposed to going lease-by-

lease—though that is not a foregone conclusion—but even so, substantial litigation of individual issues would likely be required.[27]

Also involved is the change in industry custom and usage over the last several decades. "[C]ustom and usage in the industry are used in determining the scope of duties created by the lease." Mittelstaedt, 954 P.2d at 1208. The class's claims are based on leases which were executed as far back as 1915 and as recently as 2012. During that time-period the natural gas industry has undergone substantial change, much of it related to federal deregulation. The impact of those changes on lease interpretation, on the nature and propriety of differing marketing arrangements, and the like is unclear, but they nonetheless present issues which may not be resolvable in a single stroke for all class members.

Other uncommon questions include to whom a fiduciary duty is owed, whether force-pooled royalty interests have the benefit of the implied covenant to market, whether individual class members were members of other, overlapping class actions or have otherwise settled their claims with Apache, and whether individual class members were exposed to Apache's allegedly fraudulent misrepresentations or relied on such misrepresentations. It may be that any one of these individual issues standing alone would be insufficient to defeat predominance if a common question was otherwise present. However, considering all of the issues likely to be encountered here, the court concludes that

---

[27]*Because royalty interests are communitized under Oklahoma's PRSA, plaintiff does not necessarily have to prove that all of the class leases create identical obligations. However, plaintiff must do more than point to 154 leases out of ten thousand to show that the leases create common obligations the resolution of which will predominate over individual issues.*

individual issues will predominate over any common questions.

The court recognizes that, in many respects, this case presents circumstances for which class actions were designed and it does not easily reach the conclusion that certification is not warranted.  The potential plaintiffs are many.  Some, and perhaps most, of them have claims as royalty owners which would not be economically feasible to pursue on an individual basis.  The defendant's resources for resisting any claim are substantial.  But these considerations do not overcome the impracticality of litigating the myriad individual issues present here.

Finally, the court notes that this disposition does not preclude the possibility that some class of royalty owners could pursue a class action against this defendant or other entities similarly situated.  The question before the court is whether the requirements of Rule 23 are met with respect to the class that plaintiff has proposed, and they are not.  This is an inherently circumstance-specific conclusion and there may be narrower or different proposed classes which would meet the rule's requirements.[28]  However, as the presently proposed class does not satisfy the requirements of the rule, and the problems are not readily "fixable"

---

[28]*Case-specific differences counsel against too quickly categorizing particular cases as being inconsistent with the result in some other, similar case.  A case involving gas sales to a single, affiliated company, e.g. Beer v. XTO Energy, Inc., No. CIV-07-0798-L, 2009 WL 764500 (W.D. Okla. March 20, 2009), involves, in some respects, different considerations from those, like the present case, involving marketing to multiple unaffiliated purchasers.  Similarly, statewide classes involving multiple gas fields and production circumstances present different issues than a case involving only production from a single field.  See, e.g., Weber v. Mobil Oil Corp., 243 P.3d 1 (Okla. 2010) (allowing a class action on behalf of royalty owners from the Putnam Oswego Field in west-central Oklahoma).  The range of potentially pertinent royalty clauses may also vary.*

by the use of any obvious subclasses, the motion to certify must be denied.

### V.  Other Pending Motions

Also pending before the court are plaintiff's motions for leave to file a second amended complaint and to strike Apache's response as to the recusal issues.  The proposed second amended complaint seeks to clarify the claims upon which plaintiff's motion for class certification is based, but does not otherwise change its essential thrust.  The motion to strike contends that Apache's response as to the recusal issue contained improper argument on the merits.  Given the court's disposition of Ms. Foster's motion for class certification, those motions are now moot.

For the reasons stated, plaintiff's motion for class certification [Doc. Nos. 89, 90, 152] and her motions to strike certain of Apache's affidavits [Doc Nos. 115-22, 153-56] are **DENIED**.  Additionally, her motion for leave to file an amended complaint [Doc. #142] and her motion to strike Apache's response regarding the court's recusal [Doc. #147] are **STRICKEN** as **MOOT**.

**IT IS SO ORDERED**.

Dated this 20th day of August, 2012.

_____

JOE HEATON
UNITED STATES DISTRICT JUDGE

28